IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

PAULA HUMPHRIES,
on behalf of E.H., a minor                                                            PLAINTIFF

V.                                    NO. 10-5115

MICHAEL J. ASTRUE,
Commissioner of Social Security Administration                                        DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Paula Humphries, brings this action on behalf of her minor son, E.H., seeking judicial review, pursuant to 42 U.S.C. § 405(g), of a decision of the Commissioner of the Social Security Administration (Commissioner) denying E.H.'s application for child's supplemental security income (SSI) benefits under Title XVI of the Social Security Act (Act).

**I.     Procedural Background:**

Plaintiff protectively filed the application for SSI on E.H.'s behalf on March 30, 2006, alleging that E.H. was disabled due to Attention Deficit Hyperactivity Disorder (ADHD). (Tr. 107, 109). An administrative hearing was held on November 28, 2007, at which Plaintiff and E.H. testified. (Tr. 175-210). Plaintiff was represented by counsel.

The ALJ, in a written decision dated June 2, 2008, found that E.H. was not disabled, as E.H. did not have an impairment that met or was medically or functionally equal to a listed impairment. (Tr. 16). The ALJ specifically stated she considered the listed impairments related to the mental disorders (found in section 12.00), when making her determination. (Tr. 16).

Plaintiff then requested a review of the hearing decision by the Appeals Council which

denied that request on April 30, 2010. (Tr. 2-4 ). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 6, 7).

**II.     Evidence Presented:**

E.H. was born in 1998, and at the date of the hearing, was nine years old. (Tr. 105, 179). On January 9, 2006, E.H. was seen for an initial evaluation at Vista Health Counseling Center, where it was reported that he was not doing well in school. (Tr. 144). Plaintiff reported that E.H. could not concentrate in class and tended to be "the class clown." (Tr. 144). E.H. had been on Focalin and Adderall for ADHD. (Tr. 144). Plaintiff reported that at home, E.H. "bounces off the walls," destroyed things, and was very oppositional and defiant. He also had daily anger outbursts. (Tr. 144). In the initial evaluation, it was noted that E.H. focused during the session and was cooperative in answering questions, although Plaintiff reported daily behavior problems, anger, impulsivity, and daily academic problems. (Tr. 145). E.H. was diagnosed as follows:

    Axis I      314.1 - ADHD combined type
    Axis II     none
    Axis III    none
    Axis IV     Primary support group; social environment; education

(Tr. 151).

On April 7, 2006, E.H. was again seen at Vista Health Counseling Center, where E.H. was cooperative, and presented with a pleasant mood. E.H. reported that he was "doing good" at home and school, and Plaintiff confirmed the reports. (Tr. 139). E.H. was then diagnosed with:

    Axis I      314.01
    Axis II     none

   Axis III  none
   Axis IV  Primary support
   Axis V  current GAF - 60

(Tr. 140). It was also noted that E.H. had continued problems making it to his scheduled sessions. The report indicated that the counselor met with Plaintiff and E.H., and explained E.H.'s problems focusing and completing tasks. The counselor discussed the parents' involvement at home and parenting techniques they used to guide children. The counselor also confronted Plaintiff about the future need to attend appointments, and educated her on the fact that E.H.'s therapy could be effective if she was consistent in bringing E.H. to his sessions. (Tr. 141).

On April 19, 2006, a Treatment Plan Review from Vista Health Counseling Center indicated that E.H. struggled with the inconsistent and unstable home environment, which was felt to contribute to his problems focusing and maintaining a stable environment. It was noted that Plaintiff had been very inconsistent in bringing E.H. to his sessions, which had impacted their effectiveness. (Tr. 137). Plaintiff was compassionately confronted on the issue and was educated on the importance of making scheduled appointments. (Tr. 137).

On September 5, 2006, Jeanne H. Curtis, Psy. D., of the Center for Stress Reduction, prepared a Mental Status and Evaluation of Adaptive Functioning. (Tr. 152-156). Dr. Curtis reported that E.H. related well, was being verbal and articulate for his age, had difficulty sitting still, and was active throughout the forty-five minute session. (Tr. 152). At that time, E.H. was taking the following medications - Concerta and Focalin. (Tr. 152). E.H. told Dr. Curtis that he heard the devil and that the devil "makes me be mean." (Tr. 153). According to Plaintiff, sleep medication prescribed by a physician had not been helpful. (Tr. 154). E.H. stated that he

had "lots of friends" but Plaintiff stated that she would not allow him to go to his friends' houses because E.H. could become "too rambunctious." Plaintiff reported that E.H. could concentrate on a video game for 5-10 minutes at a time, get up and move around a while, then return to the game "for hours," and that he could not sit still to watch a thirty minute television program or a movie, without medication. (Tr. 154). E.H.'s IQ was estimated to be 80 or greater, and Dr. Curtis gave the following diagnosis:

> Axis I           314.01 - ADHD, combined type
> Axis II          V71.09[1]
> Axis III         Deferred
> Axis IV          Problems with primary support group
> Axis V           GAF 55 (current)
> Prognosis: Guarded with appropriate intervention

(Tr. 155). Dr. Curtis reported that E.H. exhibited no physical problems or limitations that would interfere with his adaptive functioning. (Tr. 156). She also reported that E.H. exhibited no difficulty with concentration, persistence, or pace on any intellectual tasks. However, she noted that he did have difficulty concentrating during the interview itself, without encouragement from Plaintiff and the examiner. (Tr. 156). No limitations in adaptive functioning were identified by Dr. Curtis that were consistent with a diagnosis of Mental Retardation. (Tr. 156).

On September 16, 2006, a Childhood Disability Evaluation Form was completed by S.A. Whaley, M.D. (Tr. 157-158). Dr. Whaley found that E.H.'s impairment was severe, but did not meet, medically equal, or functionally equal the listings. (Tr. 157). Dr. Whaley addressed the domain evaluations as follows:

> 1. Acquiring and Using Information - No Limitation
> 2. Attending and Completing Tasks - Less Than Marked

---

[1] V71.09 - No diagnosis on Axis II. <u>Diagnostic and Statistical Manual of Mental Disorders</u> 26 (4th ed. 2000)

       Claimant is on Focalin and Concerta.  At MSCE he was noted to have difficulty maintaining concentration during the interview.
3. Interacting and Relating with Others - Less Than Marked
   The claimant communicates effectively but has history of disruptive behavior in the classroom though such has improved in the last few months.  He he [sic] is aggressive with his sibling.
4. Moving About and Manipulating Objects - No Limitation
5. Caring For Yourself - No Limitation
6. Health and Physical Well-Being - No Limitation

(Tr. 159-160).

    A Parent Report dated December 11, 2006, completed by one of E.H.'s second grade teachers, Mrs. Bradbury, reflects that E.H.'s grade equivalent was 2.2, meaning that E.H. read at a level equal to that of a typical second grader after the second month of the school year.  It also reflects that E.H. read at a level greater than 36% of other students nationally in the same grade. (Tr. 170).  With respect to E.H.'s instructional reading level, which was 1.9, this score meant that he was at least 80% proficient at reading first grade words and books.   (Tr. 170).  With respect to math scores, E.H.'s grade equivalent was 1.1, meaning that E.H.'s math skills were at a level equal to that of a typical first grader after the first month of the school year.  E.H.'s math skills were higher than 6% of students nationally in the same grade, which was below average. (Tr. 171).  Mrs. Bradbury wrote the following comment at the bottom of the page: "He scored a 1.1.  Help him with math at home."  (Tr. 171).

    On June 11, 2007, a Social Security Administration Teacher Questionnaire form was completed by another one of E.H.'s second grade teachers, Marla Thigpen. (Tr. 116-123).  Ms. Thigpen noted excessive tardiness during the fourth nine weeks (14 total).  (Tr. 116).   Ms. Thigpen addressed each of the various domains by stating that E.H. had:  a "serious" problem comprehending and doing math problems (Tr. 117); a "very serious" problem working without

-5-

distracting himself or others; a "serious" problem paying attention when spoken to directly, focusing long enough to finish assigned activity or task, refocusing to task when necessary, completing class/homework assignments, completing work accurately without careless mistakes; and a "serious" problem playing cooperatively with other children; making and keeping friends; and seeking attention (Tr. 118-119). She also found E.H. had no problem moving about and manipulating objects (Tr. 120); that E.H. had often come to school without bathing, as well as in dirty clothing (Tr. 121); that E.H. had been diagnosed, and was treated for ADHD; and that he took the medication on a regular basis, which seemed to help him stay on task better. (Tr. 122).

On November 26, 2007, another Teacher Questionnaire form was completed by Amanda Lowe, E.H.'s second grade teacher when he repeated the second grade. She addressed each of the various domains by stating that E.H. had: a "serious" problem comprehending oral instructions; reading and comprehending written material; providing organized oral explanations and adequate descriptions; and expressing ideas in written form. (Tr. 130). She found he had a "very serious" problem paying attention when spoken to directly; focusing long enough to finish assigned activity or task; refocusing to task when necessary; carrying out multi-step instructions; organizing own things or school materials; completing class/homework assignments; completing work accurately without careless mistakes; working without distracting self or others; and working at reasonable pace/finishing on time. (Tr. 131). She concluded that E.H. had a "serious" problem carrying out single-step instructions, and changing from one activity to another without being disruptive (Tr. 131); a "serious" problem relating experiences and telling stories; introducing and maintaining relevant and appropriate topics of conversation;

and taking turns in a conversation (Tr. 132); a "serious" problem planning, remembering, and executing controlled motor movements (Tr. 133); a "very serious" problem being patient when necessary; and a "serious" problem cooperating in, or being responsible for, taking needed medications. (Tr. 134).

At the hearing held on November 28, 2007, Plaintiff stated that she did not understand why there were so many tardies on E.H.'s school reports, because her children walked to school and they lived two blocks from school. (Tr. 181). She testified that the children would leave the house at 7:15 am and school started at 7:45 am, and that after the school called her and asked her why E.H. was late every day, she "wound up having to walk them down every morning myself to make sure that they were on time." She states that E.H. would "lollygag in the lunch room and not make it to class on time, eating breakfast." (Tr. 181). Plaintiff added that the last group of tardies was because she was having to take her children to school and at that time, they lived quite a ways from the school, would hit traffic and be a few minutes late. (Tr. 182). Plaintiff testified that when her children got out of school, they would go to the Boys and Girls Club a block away, with a teacher walking with them. (Tr. 186). Plaintiff failed to bring any of E.H.'s report cards to the hearing, but said she recently received one and that E.H. did really well in math, except for the reading problems. (Tr. 187). She stated that at a parent/teacher conference, the teacher sat down with her and said E.H. had good days and bad days, and that about three out of five days were usually bad days, when he could not sit down, and was wandering the classroom at all hours of the day. (Tr. 188).

When the ALJ questioned E.H. at the hearing, he asked E.H. if he knew what it was to tell the truth, to which E.H. stated "No." (Tr. 188). E.H. stated that his teacher talked to him

about being truthful and honest, and that he and his twin sister were repeating the second grade. (Tr. 189). E.H. testified that his best class was P.E., and that he had three friends already even though they had only moved to their house a few weeks prior to the hearing. (Tr. 191). He stated that he fed the dog, cleaned his room, picked up his toys and put them in his toy box, and put his dirty clothes in the dirty clothes basket. (Tr. 189-193). Plaintiff testified that E.H. had been on a number of regimens of medication - Strattera, Concerta, Focalin, Adderall and the Daytrana patch. (Tr. 198). Plaintiff had seen a pamphlet on the Daytrana patch and asked E.H.'s doctor about it because is was supposed to release over a nine hour period. Plaintiff stated that E.H.'s teacher said E.H. did fine between 11 and 3, but that before 11, it was like he was on nothing, and that by 4:30 or 5 it had worn off. (Tr. 200). Plaintiff also testified that they used to have cats, and although E.H. loved them, he would get really aggressive with them - lie on them, put pillows over the top of them, sit on them, choke them, throw them, swing them by the tail - she had to give the cat away. (Tr. 201). She also testified that three years prior, E.H. stuck a teddy bear in an electric heater and caught the house on fire, and the following year he and a little boy were under the house playing with gasoline, and the other little boy set his pants on fire. Plaintiff took E.H. to the fire department and had the fireman talk to him about fire dangers and safety. (Tr. 202).

Plaintiff testified that on a typical school day, her family would get up at 6 a.m., but a lot of days she did not get E.H. up until 6:20 a.m. because he was up, dressed and ready to go within five minutes. (Tr. 203). She stated that E.H. would put his patch on, go to the refrigerator, eat, and go to school and eat. When he came home after school, he set aside between 6:30 p.m. and 7:00 p.m. to do homework, and that homework "is almost an act of congress to get one page of

homework done unless it's math," which E.H. would do quickly. (Tr. 203). Plaintiff testified that the reason she could not get E.H. to counseling regularly was because she had transportation issues, and could not take him every week. (Tr. 206). However, she testified that she was in the process of getting him counseling through Ozark Guidance Center, where he would be able to get counseling at the school. (Tr. 206). Plaintiff stated that E.H. had been suspended a couple of times from school for fighting. (Tr. 206). She also testified that his twin sister repeated the second grade as well because she also had a reading issue. (Tr. 207).

### III. Applicable Law

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

The regulations prescribe a three-step process for making the disability determination. First, the ALJ must determine whether the child has engaged in substantial gainful activity. See

20 C.F.R. 416.924(b). Second, the ALJ must determine whether the child has a severe impairment or combination of impairments. See 20 C.F.R. 416.924(c). Third, the ALJ must determine whether the severe impairment(s) meets, medically equals, or functionally equals a listed impairment. See 20 C.F.R. § 416.924(d). In the present case, the ALJ found that E.H.'s claim failed at step three, as E.H. did not have an impairment that met or medically or functionally equaled a listed impairment. The ALJ specifically considered the Listing in 12.00 when making this determination. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

First, the Court finds there is substantial evidence on the record to support the ALJ's determination that E.H.'s impairment did not meet or medically equal in severity any listed impairment. See 20 C.F.R. Part 404, Subpt. P, App. 1, Part B. The Court next addresses whether E.H.'s impairments are functionally equal to any listed impairment, or, in other words, whether "what [E.H.] cannot do because of [his] impairments . . . is functionally equivalent in severity to any listed impairment that includes disabling functional limitations in its criteria." 20 C.F.R. § 416.926a(a). Functional equivalence may be established by demonstrating marked limitations in two, or extreme limitations[2] in one of the following "domains:" 1) acquiring and

---

[2]((2)Marked limitation -(i)We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean....
(3)Extreme limitation - (i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § § 416.926a(e)(2) and (3).

using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for yourself; and 6) health and physical well-being.  See 20 C.F.R. § § 416.926(b)(1), 416.926a(d).  The ALJ should consider all relevant evidence in the case to determine whether a child is disabled, and the evidence may come from acceptable medical sources and from a wide variety of "other sources," including teachers. SSR 09-2P.  In fact, the Commissioner's regulations for childhood disabilities "provide that parents and teachers, as well as medical providers, are important sources of information."  Lawson v. Astrue, 2009 WL 2143754, at *9 (E.D. Mo. July 13, 2009), citing 20 C.F.R. § 416.9249.

The ALJ determined that the facts in this case suggested that E.H. had less than marked limitation in acquiring and using information; a marked limitation in attending and completing tasks; less than marked limitation in interacting and relating with others; no limitation in moving about and manipulating objects; no limitation in the ability to care for himself; and less than marked limitation in health and physical well-being.  (Tr. 18-22).

The Court addresses each of the ALJ's domain determinations as follows:

**1. Acquiring and using information:**

In making the determination that E.H. had less than marked limitation in this area, the ALJ discussed the fact that E.H.'s tardiness fell within the realm of Plaintiff's responsibilities, and the possible lack of support and motivation at home. (Tr. 18).  She also found that E.H.'s difficulty with focusing and maintaining attention was alleviated with prescribed medication, as well as the fact that E.H. was reading at the second grade level, which was average, and that his math skills were at the first grade level, which was below average.  Mrs. Bradbury also indicated in her Parent Report that E.H. needed help with his math at home.

-11-

Teachers Thigpen and Lowe reported that E.H. had a "serious problem" reading and comprehending written material.³ Teacher Thigpen felt his problems in this area were due to his lack of focus, lack of desire/motivation, and lack of support at home. Teacher Lowe reported that E.H. had a "serious problem" in four separate areas of this domain, and stated that when E.H. was able to focus, he was functioning on grade level with his peers.

Dr. Whaley and S. Manley concluded that E.H. had no limitation in acquiring and using information. However, their evaluations occurred in 2006, while Teachers Thigpen and Lowe completed the questionnaires in June and November of 2007, respectively.

The Court has found cases where the courts have, in essence, equated the terms "serious" and "very serious" used in the teacher questionnaire with the terms "marked limitation" and "extreme limitation," respectively, used in the regulations. Matthews v. Astrue, 2010 WL 2985703, at*8 (E.D. Wisc. July 27,2010)(student's teacher rated student as having a "serious problem" in four areas in one of the domains, and the court held this supported a marked limitation rather than extreme limitation); Rossi v. Commissioner of the SSA, 2010 WL 5313771, at *8 (N.D.N.Y. Dec. 2, 2010)(court held that a "very serious problem" coincides with the regulatory definition of an extreme limitation and "serious" problems correspond with "marked" limitations). However, the court in Stephenson v. Astrue, 2008 WL 4287952 (W.D. La. Sept. 18, 2008 ), held otherwise, when Plaintiff urged him to equate the two phrases:

> The fallacy with plaintiff's argument is that according to the Commissioners Program Operations Manual System ("POMS") the ratings of the teacher questionnaire, Form SSA-5665-BK, do not translate directly into the ratings used on the Childhood Disability

---

³The rating key used by the teachers included the following categories: 1 - No Problem; 2 - A slight problem; 3 - An obvious problem; 4 - A serious problem; and 5 - A very serious problem. The Court is only discussing the items the teachers marked as "serious" or "very serious" in this opinion.

>Evaluation Form, SSA-538. *See* POMS DI 25205.030 (5). There is no formula for converting the teacher questionnaire ratings into domain ratings. (citation and footnote omitted). The questionnaire provides extremely useful information about the claimant's day-to-day functioning, but it must be considered in conjunction with other record evidence (citation omitted).

Id. at *3.

The undersigned does not need to resolve the conflicting court decisions in the case now before it, since the Court finds that the fact that Teachers Thigpen and Lowe found that E.H. had "serious problems" in this domain warrants further consideration by the ALJ, especially since the ALJ did not even discuss the teachers' opinions relating to this domain. See Lawson, 2009 WL 2143754 at *10. Instead, the ALJ referenced school records which indicated E.H. was reading at the second grade level, which was average, and that his math skills were at the first grade level, which was below average, with recommendations that the mother assist the child with homework. The Court believes the ALJ should re-evaluate the facts and address the teachers' opinions, and determine whether E.H.'s limitations in this domain rise to the level of a "marked" limitation.

**2. Attending and Completing Tasks**:

The ALJ found that E.H. had "marked limitation" in attending and completing tasks. She reported that the evidence in the file indicated that E.H. had considerable difficulty in remaining focused, and that the medication prescribed alleviated his difficulties somewhat. She further found that the evidence indicated E.H. needed constant reminders to remain focused on the tasks at hand. Teacher Thigpen indicated that E.H. had a "very serious" problem working without distracting himself and others, and had a "serious" problem paying attention when spoken to directly, focusing long enough to finish an assigned activity or task, refocusing to task when

-13-

necessary, and completing class/homework assignments/completing work accurately without careless mistakes. She felt that most of E.H.'s difficulties in this regard stemmed from his inability to stay focused. Teacher Lowe indicated E.H. had a "very serious" problem in nine of the thirteen categories in this domain, and needed a constant reminder to get busy and stay focused. Dr. Whaley and S. Manley concluded that E.H. had "less than marked limitation" in this area. Although the ALJ found E.H. had a marked limitation in this area, in light of the numerous categories in this domain where the teachers felt E.H. had "very serious" problems, and the ALJ's lack of discussion of the teachers' opinions, the Court believes the ALJ should re-evaluate the facts, address the teachers' opinions, and determine whether E.H.'s limitations in this area rise to the level of an "extreme" limitation.

### 3. Interacting and Relating with Others:

The ALJ found that E.H. had "less than marked limitation" in this domain. The ALJ recognized that the evidence contained in the file indicated that E.H. had some difficulties in this area. The ALJ noted that school records indicated E.H. seemed immature for his age and tended to annoy others, and that E.H.'s mother reported that he was "mean" to animals, and another evaluation demonstrated some aggressive behavior towards his siblings. The ALJ nevertheless relied upon the report prepared when E.H. visited the Vista Health Counseling Center on April 7, 2006. At that time, E.H. was noted as cooperative, pleasant, and doing well at home and school, and Plaintiff confirmed these reports. Dr. Curtis found that E.H. related well, and was verbal and articulate for his age. E.H. also told Dr. Curtis that he had "lots of friends" but his mother stated she would not allow him to go to his friends' houses because he could become "too rambunctious." Dr. Whaley found that E.H. had "less than marked limitation in this

domain, stating that E.H. communicated effectively, but had a history of disruptive behavior in the classroom "though such has improved in the last few months." S. Manley also found that E.H. had "less than marked limitation" interacting and relating with others, and that his communication was effective. Once again, however, subsequent to the above reports, Teacher Thigpen found E.H. to have a "serious problem" playing cooperatively, making friends, and seeking attention appropriately. Teacher Lowe found E.H. had a "serious problem" relating experiences and telling stories, introducing and maintaining relevant and appropriate topics of conversation, and taking turns in a conversation. The Court believes the ALJ should re-evaluate the facts, address the teachers' opinions, and determine whether E.H.'s limitations in this area rise to the level of a "marked" limitation.

**4. Moving About and Manipulating Objects:**

The ALJ determined E.H. had no limitation in this area. This was confirmed by Teacher Thigpen. Teacher Lowe reported that E.H. had a "serious" problem planning, remembering, and executing controlled motor movements, stating that he had trouble planning and then executing that plan. "He just wants to go, go, go!" Dr. Whaley and S. Manley reported that E.H. had no limitation in this area. Since the Court is remanding this matter, the ALJ is also directed to consider, re-evaluate, and address Teacher Lowe's opinion in this domain.

**5. Caring for Yourself:**

The ALJ found that E.H. had no limitation in the ability to care for himself. She stated that the evidence indicated that he was able to care for his own personal hygiene, dressing and eating, and that the records from Vista Health Counseling Center indicated that E.H. exhibited normal grooming and cleanliness. Dr. Whaley and S. Manley reported that E.H. had no

limitation in this area. Teacher Thigpen reported that E.H. had often come to school without bathing, as well as in dirty clothing. However, she did not feel that this occurred because he could not take care of himself, but rather because he lacked the support from others. Teacher Lowe reported that E.H. had a "very serious" problem being patient when necessary, and a "serious" problem cooperating in, or being responsible for, taking needed medications. She also stated that E.H. needed to learn patience and to make it to school on time to eat breakfast if it was not available at home. Since the Court is remanding this matter, the ALJ is also directed to consider, re-evaluate, and address Teacher Lowe's opinion in this domain.

### 6. Health and Physical Well-Being:

The ALJ determined E.H. had "less than marked" limitation in this area. In making this determination, the ALJ noted that the evidence in the file indicated that E.H. continued to struggle with the inconsistent and "unstable" home environment, which contributed to his problems focusing and maintaining a stable mood, as well as Plaintiff's inconsistencies in handling his treatment sessions, which impacted the level of effectiveness of the sessions. In Dr. Curtis' Mental Status and Evaluation of Adaptive Functioning, dated September 5, 2006, she indicated that E.H. had a Global Assessment of Functioning of 55, indicating moderate difficulty in social or school functioning. She also found that E.H. had no limitations in adaptive functioning, and had an estimated IQ of 80 or greater. The ALJ noted that school records indicated that E.H. did not always get his breakfast, "which may be a factor in his ability to focus and maintain attention." Dr. Whaley and S. Manley found E.H. had no limitation in this area of functioning. Teacher Thigpen acknowledged that E.H. had been diagnosed, and was treated for, ADHD, and that his medication seemed to help him stay on task better. However, Teacher

Thigpen also reported that E.H. often could not sit still or stay quiet, and that he found ways to make noise with most of his school supplies, which was an extreme distraction for others. Teacher Lowe reported that E.H. had a patch for ADHD and that when the medications were in his system for a while, he was more focused. Since the Court is remanding this matter, the ALJ should also consider, re-evaluate the facts, and specifically address Teacher Thigpen's opinion in this domain.

IV. **Conclusion:**

For the reasons stated herein, the Court hereby finds that there is not substantial evidence to support the ALJ's findings, and therefore remands this matter to the ALJ with directions to re-evaluate her decision in accordance with the Court's instructions.

**The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 31st day of October, 2011.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)